**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

In Re: Air Crash at Toronto Pearson International Airport on February 17, 2025

MDL No. 25-3155 (JWB/JFD)

This Document Relates To:
Vanessa Miles
Alita Parker

**PLAINTIFFS VANESSA MILES AND ALITA PARKER'S SUPPLEMENTAL MEMORANDUM REGARDING ARTICLE 17 "PASSENGER" STATUS**

## INTRODUCTION

The Convention contains no employee or deadhead exclusion. The text and authorities support an objective, flight-specific inquiry: did the carrier undertake to carry the occupant, and what did her required presence accomplish on the accident flight? A prescribed itinerary is important evidence, but not a treaty element. Passenger status can coexist with employment when presence supplies transportation to separate work; it may be absent when presence serves an aircraft- or flight-specific operational obligation. The analysis does not turn on the label "employee," the absence of a retail ticket, or the employee's subjective knowledge of every scheduling option.

That formulation follows the treaty. Article 1 applies to international carriage of "persons," including "gratuitous carriage performed by an air transport undertaking." Article 3 regulates transportation documents and provides that noncompliance with its documentation requirements does not affect the existence or validity of the contract of carriage. Article 17 protects a "passenger" but does not define the term or exclude carrier employees. Montreal Convention arts. 1(1), 1(3), 3(1), 3(5), 17(1), S. Treaty Doc. No. 106-45, at 28–30, 33 (2000).

The principal cases divide along function, not status. *In re Mexico City Aircrash of October 31, 1979* remanded a deadheading attendant's status on an incomplete record. *Sulewski v. Federal Express Corp.* denied passenger status to an aircraft-specific traveling mechanic but contemplated it when he later deadheaded home. *In re Air Crash Off Long Island, N.Y., on July 17, 1996* involved employees positioned to become the operating crew of the same Flight 800 after a 45-minute stop.

Their results turn on what required presence served. Those decisions do not make itinerary choice a treaty element. When the Court asked whether evidence that an employee lacked an option answered passenger status, it observed that the evidence "may answer a question that is probative, or it may not." Aug. 20, 2026 Hr'g Tr. 18:7–12. The ordered record tests both the itinerary's force and the reason for presence on Flight 4819; one relevant fact should not become an unwritten categorical exclusion.

## I. THE TEXT REQUIRES CARRIAGE AND PASSENGER STATUS, NOT A RETAIL TICKET OR A NONEMPLOYEE LABEL.

Article 1 governs "all international carriage of persons" by aircraft for reward and gratuitous carriage by an air transport undertaking. Montreal Convention arts. 1(1), 1(3). It says "persons," not customers, fare-paying travelers, or nonemployees. Article 17 makes the carrier liable for death or bodily injury of a "passenger" when the accident occurs onboard or during embarking or disembarking. *Id.* art. 17(1). Neither provision excludes an employee, a person traveling for work, or a person whose transportation was arranged and paid for by another.

Article 3 confirms that passenger status does not depend on a conventional retail ticket. The carrier must deliver a transportation document or other record containing

specified information, but noncompliance with those requirements does not affect the contract's existence or validity. *Id.* art. 3(1), (5). Under the Warsaw framework, a contract of carriage required the carrier's undertaking to transport and the traveler's consent; it did not require personal bargaining, direct payment, or a contract made in the traveler's own name. *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 332–34 (5th Cir. 1967).

A third-party arrangement and an employment relationship therefore can coexist with carriage. *Block* treated the ticket and related arrangements as evidence of the undertaking rather than as the exclusive source of a contract. *Id.* at 332–34. In *Wucher Helicopter GmbH & Euro-Aviation Versicherungs AG v. Fridolin Santer*, the Court of Justice of the European Union held that a worker transported under a contract between his employer and an Austrian helicopter carrier qualified as a passenger for Montreal Article 17, subject to the European Union statutory framework. Case C-6/14, ECLI:EU:C:2015:122, ¶ 27–31, 37–42 (C.J.E.U. Feb. 26, 2015) (Ex. 1). The common point is modest: who arranged or paid for carriage does not alone decide who was carried as a passenger.

The authentic texts supply no employee-specific distinction. Warsaw's sole authentic text was French. Article 1 used *personnes*. Article 3(1) referred to *transport de voyageurs* and required a *billet de passage*; Article 3(2) separately provided that a ticket's absence, irregularity, or loss did not affect the existence or validity of the *contrat de transport*. Article 17 used *voyageur*. Warsaw Convention arts. 1, 3, 17, 49 Stat. 3001, 3005 (1934). Montreal's English text uses "persons" in Article 1 and "passenger" in Articles 3 and 17; Article 3(5) uses "contract of carriage." Montreal Convention arts. 1, 3, 17, S.

Treaty Doc. No. 106-45, at 28–30, 33. The equally authentic French text correspondingly uses *personnes*, *passager*, and—in Article 3(5)—*contrat de transport*. *Convention de Montréal* arts. 1, 3, 17; see Montreal Convention art. 53(1). Montreal did not even adopt one passenger noun uniformly: Article 36(1) uses *voyageurs*, while paragraphs 2 and 3 of that same article use *passager*. *Convention de Montréal* arts. 1, 3, 17, 36, May 28, 1999, 2242 U.N.T.S. 309 (authentic French text); see Montreal Convention art. 53(1). That internal variation undercuts an inference that the shift from Warsaw's *voyageur* to Montreal's *passager* silently created an employee exclusion.

Nor does "air transport undertaking" create one. That phrase identifies the kind of carrier whose gratuitous carriage is covered. Montreal Convention art. 1(3). *Lavergne v. ATIS Corp.* accordingly turned on whether a private aircraft operator was an air-transport enterprise or undertaking, not on an employee exception. 767 F. Supp. 2d 301, 307–10 (D.P.R. 2011). The court's separate discussion of assigned employees repeated the reasoning of *Sulewski* and was not necessary to its operator-status holding. *Id.* at 308–10. The treaty text thus requires a qualifying undertaking of carriage and passenger status; neither question is answered simply by employment.

## II. THE DRAFTING AND RATIFICATION RECORD PRESERVES WARSAW PRECEDENT WITHOUT CREATING AN EMPLOYEE RULE.

The Senate Foreign Relations Committee reported that Montreal's negotiators intended to preserve relevant Warsaw precedents and retained existing language and substance to avoid unnecessary re-litigation. S. Exec. Rep. No. 108-8, at 3 (2003). That instruction matters because Articles 1, 3, and 17 retain the Warsaw framework of covered carriage, a contract evidenced but not created by documentation, and carrier liability for a

passenger injured aboard the aircraft. The cited ratification materials identify modernization and consolidation, not a new rule converting all employees on duty travel into nonpassengers.

The official U.S. ratification record quotes the specific ICAO drafting passages relevant to continuity. It explains that the Reference Text tracked prior wording "to the greatest extent possible" to preserve precedent. S. Exec. Rep. No. 108-8, at 68 (2003). It then quotes the Legal Committee's Rapporteur as describing the project as modernization while incorporating the Warsaw System "as far as possible." *Id.* (quoting *Report of the 30th Session of the Legal Committee* ¶ 4:5, ICAO Doc. 9693-LC/190 (May 9, 1997), reprinted in ICAO Doc. 9775-DC/2, *International Conference on Air Law*, vol. III (Preparatory Materials), at 151, 159).

The same Senate report attributes two further instructions to the ICAO record. The Legal Committee chair stated that Warsaw wording should not be changed unless modernization or consolidation required it, and the Drafting Group understood that linguistic refinements would not alter substance. S. Exec. Rep. No. 108-8, at 68 (2003) (quoting ICAO Doc. 9693-LC/190 ¶¶ 4:83, 4:231). The Executive Branch also knew of no Warsaw provision carried forward into Montreal whose English wording materially changed its meaning. *Id.* at 70. These are the Senate report's reproductions of the ICAO materials; Plaintiffs do not represent that the report is the complete diplomatic record.

The narrower and supportable inference is enough. Neither the cited ICAO passages nor the cited ratification materials identifies a proposal to exclude carrier employees, define deadheaders as crew, require payment by the traveler, or replace the fact-specific Warsaw

cases. S. Treaty Doc. No. 106-45, at ix–xii; S. Exec. Rep. No. 108-8, at 3, 68–70. Their affirmative instruction is continuity where text and substance were retained. Courts accordingly consult Warsaw precedent when Montreal's corresponding language is materially unchanged. *Moore v. British Airways PLC*, 32 F.4th 110, 119 & n.2 (1st Cir. 2022); *Dagi v. Delta Airlines, Inc.*, 961 F.3d 22, 27–28 & n.4 (1st Cir. 2020).

That continuity must be disciplined. After examining the authentic French text and the Warsaw drafting record, *Block* held that the requisite contract may consist of the carrier's undertaking to transport and the traveler's assent to the agreed transportation and route; direct payment, personal bargaining, and a contract made in the traveler's own name are unnecessary. 386 F.2d at 331–34. The Warsaw Convention itself contains no employee-specific definition or exclusion. Warsaw Convention arts. 1, 3, 17, 49 Stat. 3001–02, 3005. Nor do the portions of the Warsaw proceedings examined in *Block* identify such a rule. See *Block*, 386 F.2d at 335–36. *Mexico City*, *Sulewski*, and *Long Island* therefore remain useful according to their actual holdings, operational facts, and the reason each employee had to be aboard the accident flight—not as evidence of an employee exclusion in the treaty.

## III. UNITED STATES AUTHORITY MAKES THE REASON FOR REQUIRED PRESENCE CENTRAL.

*In re Mexico City Aircrash* supplies the starting point. Three Western Airlines employees were before the Ninth Circuit. Two were working flight attendants and therefore were not passengers. The third, Dzida, was deadheading to begin duty on another flight. The court held the record insufficient because it did not establish whether she was contractually obligated to take Flight 2605 or could choose another means. 708 F.2d 400,

416–18 (9th Cir. 1983). If free to choose, the court said, she qualified as a passenger notwithstanding full pay and half flight-time credit. *Id.* at 417–18.

The court framed the ultimate inquiry as whether the primary purpose of the travel was transportation or the performance, or on-call performance, of employment duties. *Id.* at 417–18. Its footnote 32 summarized the line as excluding employees actually on duty while covering employees supplied transportation to their assigned place of duty. *Id.* at 418 n.32 (citing D. Goedhuis, *National Airlegislations and the Warsaw Convention* 129–30 (1937)). Freedom to select another mode was sufficient to support passenger status on the hypothesis before the court. But the decision remanded; it did not hold the converse—that a prescribed itinerary always defeats passenger status without regard to why presence on that flight was required.

*Mexico City*'s treatment of *Demanes v. United Air Lines* reinforces that employment trappings do not decide capacity. Four United pilots were deadheading home after assignments, had no responsibility for operation or maintenance, received half pay and flight-time credit, and held tickets marked "UA Crew Member-Passenger." 348 F. Supp. 13, 14–15 (C.D. Cal. 1972). *Demanes* held that the pilots were outside the course and scope of employment for domestic workers' compensation and Death on the High Seas Act purposes; it was not an Article 17 ruling. *Id.* The Ninth Circuit nevertheless described *Demanes* as treating the pilots as passengers for airline-liability purposes and found its analysis potentially applicable to Dzida, while acknowledging that the precise question differed. *Mexico City*, 708 F.2d at 417–18.

*Sulewski v. Federal Express Corp.,* 933 F.2d 180, 181–82, 185–87 (2d Cir. 1991), illustrates when a particular-flight requirement reflects a genuine flight-specific function. Flying Tiger assigned its traveling mechanic to Flight 66 to provide aircraft-specific maintenance coverage at stations where the carrier had no mechanics. He supervised ground handling and fueling, cleared logbook items, performed preflight and post-flight inspections, communicated airworthiness changes, and remained available to advise the operating crew about mechanical problems. His presence aboard Flight 66 was therefore part of a continuing, aircraft-specific assignment—not merely transportation to reach a later work assignment. *Id.* at 185–87.

*Sulewski* is adverse because the court held that special-permission flexibility did not alter the mechanic's required specific-flight assignment and rejected any rule requiring active in-flight duties. *Id.* at 185–87. But both holdings arose from an operational assignment tied to that aircraft: his presence protected Flight 66 at intermediate stations and during any diversion. The court did not hold that a particular-flight requirement, divorced from such a function, is independently dispositive. It also explained that, after Sulewski completed his aircraft-specific duties, he would have been a passenger if he traveled home off duty in deadhead status on a Flying Tiger flight. *Id.* at 186. His employment relationship remained constant; what changed was whether his presence served the accident aircraft's operation or merely transported him from one place to another. Approval-dependent flexibility is relevant, but function remains the critical distinction.

*In re Air Crash Off Long Island, N.Y.* is Defendants' strongest domestic authority. Loffredo and Edwards had no transportation options and were contractually required to deadhead on Flight 800 as part of their work assignment. 30 F. Supp. 2d 631, 632–33, 635–36 (S.D.N.Y. 1998). The district court treated that mandatory assignment as central: they boarded to fulfill employment obligations rather than as commuters choosing transportation. *Id.* at 635–36. That reasoning gives a prescribed itinerary substantial, and on those facts decisive, weight.

The rest of the assignment explains the holding's reach. Loffredo and Edwards were members of a 17-person crew assigned to become the operating crew of the same Flight 800 on its Paris-to-Rome continuation after a 45-minute stop. *Id.* at 632–33, 636. Their required presence on the New York-to-Paris segment immediately supplied the crew for that same flight's continuing operation. *Long Island* did not consider a prescribed positioning segment followed by a hotel, a required rest period, and a separate later assignment. Its holding cannot fairly be ignored, but neither should its mandatory-itinerary language be detached from the integrated Flight 800 assignment before the court.

## IV. FOREIGN AUTHORITY SUPPORTS A FUNCTIONAL INQUIRY, SUBJECT TO DISCLOSED LIMITS.

Decisions of fellow signatories receive "considerable weight" in construing an international air treaty. *Air France v. Saks*, 470 U.S. 392, 404 (1985); see *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 175–76 (1999). They are persuasive, not controlling, and their value depends on the text and legal regime they construed. The most instructive English-language decisions here arise from different legal settings and must be used with those differences expressly stated.

*Wucher Helicopter GmbH & Euro-Aviation Versicherungs AG v. Fridolin Santer*, Case C-6/14, ¶¶ 5–9, 32–36 (Ex. 1), arose from a domestic Austrian helicopter flight. European Union Regulation No. 2027/97 extended Montreal's liability regime to domestic carriage by European Union air carriers. *Id.* ¶¶ 5–9, 32–36. Santer worked for the carrier's customer, traveled under a contract between his employer and the carrier, guided the pilot to avalanche-control sites, and opened and held the door at the pilot's instruction. *Id.* ¶¶ 13–14, 26.

Applying Regulation No. 785/2004's definition—which excluded on-duty flight and cabin crew—the Court of Justice held Santer a passenger, not crew. *Id.* ¶¶ 21–31. It then held that a person satisfying that definition also falls within Montreal Article 17 when carried under a contract of carriage; Article 3(5) made documentary form immaterial to the contract's existence or validity. *Id.* ¶¶ 37–42. *Wucher* is not a carrier-employee case, and its crew/passenger boundary partly rests on European Union legislation. Within those limits, it demonstrates that work purpose, third-party contracting, and even an assigned onboard task do not invariably preclude passenger status.

*Fellowes or Herd v. Clyde Helicopters Ltd.,* [1997] UKHL 6, [1997] A.C. 534 (H.L.) (appeal taken from Scot.), is a limited analogy because it applied a United Kingdom domestic order, not Warsaw or Montreal. (Ex. 2, PDF pp. 2–4). Lord Mackay also cautioned that the Convention authorities involved provisions "very substantially different in important respects," particularly ticketing requirements omitted from the domestic order. (*Id*. at p. 6). Yet its functional reasoning is instructive. Herd performed police surveillance, requested maneuvers, and supplied information, but the carrier's pilot alone controlled the

helicopter. (*Id*. at p. 3). The House held Herd a passenger because his activities did not contribute to carrying himself or others. (*Id*. at p. 4). Thus work purpose and assigned onboard activity do not necessarily defeat passenger status when the occupant does not operate the aircraft or contribute to the carriage.

*Herd* also supplies an English-language account of a potentially adverse line of French authority involving a trainee pilot, a test flight, an aerial-survey arrangement that did not specifically provide for carriage, and a carrier employee. (Ex. 2, PDF pp. 7, 11). Plaintiffs cite that English-language discussion—not the underlying French decisions, which they have not obtained or independently reviewed. Lord Hope noted that French opinion appeared divided and declined to treat one country's jurisprudence as compelling. (*Id.* at PDF p. 11). Those specialized relationships do not establish a categorical deadheading rule.

Australia provides a favorable functional application under a domestic statute. In *Endeavour Energy v. Precision Helicopters Pty Ltd*, [2015] NSWCA 169, ¶¶ 84-94 (Austl.) (Ex. 3), an electricity provider contracted for a helicopter and pilot to inspect power lines. An injured employee-observer supplied route and hazard information, but neither physically operated nor controlled the helicopter and was not employed by the carrier. The New South Wales Court of Appeal held him a passenger under the Civil Aviation (Carriers' Liability) Act 1967 (NSW). The case did not apply Montreal and involved the carrier's customer rather than the carrier's employee. Within those limits, it confirms that work purpose and assigned onboard activity do not alone answer passenger status.

## V. COMMENTARY CONFIRMS THE DIVIDE BUT DOES NOT SUPPLY A CATEGORICAL ANSWER.

Goedhuis—the commentator *Mexico City* identified as directly addressing airline employees—distinguished employees actually on duty from employees supplied transportation to their assigned place of duty. D. Goedhuis, *National Airlegislations and the Warsaw Convention* 129–30 (1937), cited in *Mexico City*, 708 F.2d at 418 n.32. Plaintiffs invoke that account through the Ninth Circuit's verified description, not as an independently reviewed quotation. It supports the central distinction between presence that serves the accident flight and carriage that supplies transportation to later work.

The commentary summarized in *Sulewski* likewise supports a flight-specific inquiry. Miller distinguished transportation as the journey's essential purpose from carriage accessory to an onboard activity, such as flight instruction or aircraft testing. Georgette Miller, *Liability in International Air Transport* 8 (1977), quoted in *Sulewski*, 933 F.2d at 184–85. Goldhirsch similarly distinguished employees carried "in connection with their duties" from those carried "as an accommodation." Lawrence B. Goldhirsch, *The Warsaw Convention Annotated: A Legal Handbook* 10 (1988), quoted in *Sulewski*, 933 F.2d at 185. Read with *Sulewski*'s deadhead hypothetical, those formulations distinguish duties connected to the accident flight from transportation to separate later work; they do not make employment purpose alone disqualifying.

Nicolas Mateesco Matte stated the position most favorable to Defendants: when an employee is carried by the employer, the preexisting contract of hire governs rather than Warsaw. Treatise on Air-Aeronautical Law 385 (1981), cited in *Sulewski*, 933 F.2d at 185. The Second Circuit cited that view but did not adopt an across-the-board employment rule;

its later-deadhead hypothetical recognized possible passenger status for the same employee. *Id*. at 186. The conflict among commentators confirms that commentary cannot displace the text and the cases' fact-specific analysis.

## VI. THE COURT SHOULD APPLY THE RULE TO THE OBJECTIVE, FLIGHT-SPECIFIC RECORD.

At the August 20 hearing, the Court accurately distilled the authorities into two related inquiries: whether the carrier undertook carriage and the primary purpose of the person's presence aboard. Aug. 20, 2026 Hr'g Tr. 6:10–7:2. First, there must be an undertaking of international carriage and the occupant's assent; direct fare payment and personal bargaining are unnecessary. *Block*, 386 F.2d at 332–34. Second, the Court should determine why the employee had to be present on the accident flight—transportation to separate later work, or fulfillment of an employment obligation tied to that aircraft, flight, or its immediate operation. *Mexico City*, 708 F.2d at 417–18; *Sulewski*, 933 F.2d at 184–87; *Long Island*, 30 F. Supp. 2d at 635–36.

A prescribed itinerary belongs in that analysis, but is not a freestanding treaty test. *Mexico City* treated freedom to use another means as strongly supportive; *Sulewski* held that change only by special permission did not alter an aircraft-specific assignment; and *Long Island* gave a mandatory itinerary decisive weight where it positioned the immediate operating crew of the same flight. The Court's observation that no-option evidence may or may not answer a probative question correctly preserves those distinctions. Hr'g Tr. 18:7–12. The legal question is not simply whether the schedule named Flight 4819, but what obligation the required presence on Flight 4819 served.

A plaintiff's understanding is relevant to assent, perceived compulsion, and expected consequences, but it is not a substitute for the objective arrangement. The Court therefore ordered both individual declarations and the carrier's policies, scheduling and travel-authorization records, manifests, crew-complement information, conversion materials, and hotel-and-rest evidence. ECF No. 93 at 1–3. Policies, instructions, approvals, and actual practice may establish whether alternative travel objectively existed and, more importantly, whether either Plaintiff's presence carried any Flight 4819-specific work obligation. Neither incomplete personal knowledge nor a carrier's litigation label can override the actual relationship. A mandatory-flight requirement establishes compulsion; standing alone, it does not establish that the employee served an operational function on that flight. The objective record controls.

The ordered categories map directly onto the rule. Travel authorization, scheduling directions, and approved alternatives bear on undertaking, assent, and the force of the itinerary. Manifests, crew complement, briefings, assigned positions, conversion authority, and onboard responsibilities bear on whether presence served Flight 4819's operation. Hotel, ground-transportation, rest-period, and next-assignment records bear on whether later work was an immediate continuation of the accident flight, as in *Long Island*, or a separate assignment for which the flight supplied transportation. *Id.*

This structure avoids opposite errors. A business reason for reaching Toronto does not itself define capacity; ordinary business travelers also travel because work awaits. But the absence of assigned operating duties during the accident segment is not alone conclusive; *Long Island* shows that positioning may serve an integrated operational

assignment before active service begins. Presence protecting airworthiness, supplying technical support, or positioning the same flight's immediate crew points away from passenger status; carriage to separate later work with no accident-flight function points the other way. Itinerary evidence measures compulsion, while crew, conversion, rest, and next-assignment evidence identifies what that compulsion served. Making the schedule conclusive would render much of the ordered evidence superfluous; ignoring it would conflict with *Long Island*. The functional inquiry gives every ordered category a role.

**CONCLUSION**

Montreal preserved the Warsaw framework without creating a textual employee bar. The Court should require an undertaking of carriage and determine the primary purpose of each Plaintiff's required presence on Flight 4819. A prescribed itinerary is substantial evidence when it implements a flight-specific operational assignment; it is not a categorical exclusion found in the treaty. *Long Island* is fact-bound, *Sulewski* turns on extensive aircraft-specific duties, and *Mexico City* requires factual development. The Court should apply that standard to the complete ordered record at summary judgment.

Respectfully submitted,

**MIKE MORSE LAW FIRM, PLLC**

Attorneys for Plaintiff

*/s/Madeline M. Sinkovich*______

Madeline M. Sinkovich P-82846
24901 Northwestern Highway, Suite 700
Southfield, MI 48075-1816
(248) 350-9050
Madeline.sinkovich@855mikewins.com

Dated: September 18, 2026

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum complies with Local Rule 7.1(f) and Local Rule 7.1(h). This memorandum contains 15 pages, excluding items not counted under Local Rule 7.1(f), as determined by Microsoft Word. The memorandum uses 13-point Times New Roman font.

Dated: September 18, 2026

*/s/ Madeline M. Sinkovich*

## CERTIFICATE OF SERVICE

I, Madeline Sinkovich, certify that this Motion was served on all parties of record and the Court through CM/ECF filing on September 18, 2026.

*/s/Madeline M. Sinkovich*______
Madeline M. Sinkovich P-82846